UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 22-cr-00350 (JEB) |
| JUSTIN DEE ADAMS, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Justin Dee Adams to 27 months of imprisonment—the midpoint of the Guidelines range—three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.    INTRODUCTION

The defendant, Justin Adams, participated in the January 6, 2021 attack on the United States Capitol—a violent attack which interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Adams, a licensed gun dealer from West Jordan, Utah with a history of assaultive and disorderly conduct, was part of the mob that stormed the police line on the West Front of the Capitol. While attacking the police line, Adams struck a Metropolitan Police Department (MPD) Lieutenant twice in the head. After assaulting the officer, other rioters pulled Adams back, but he continued to yell and threaten officers.   Several minutes after assaulting the MPD Lieutenant, Adams threw a plastic bottle at another MPD officer. This officer was one of many who attempted to prevent Adams and other rioters from removing metal barricades and advancing further toward the Capitol. After throwing the bottle, Adams forcefully pulled a piece of the barricade out of the hands of a police officer and dragged it away into the mob. Minutes later, rioters surged through a gap in the police line created by Adams' removal of the barricade link, taking over the Upper West Plaza, and eventually pouring into the Capitol building.

The government's recommendation of a 27-month sentence reflects the gravity of Adams's conduct and serves the sentencing purposes laid out in 18 U.S.C. 3553(a), while also giving due consideration to his guilty plea.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 20, for a short summary of the January 6, 2021 attack on the United States Capitol by

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Justin Adams's Role in the January 6, 2021 Attack on the Capitol

Justin Adams participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the MPD, open-source video, and surveillance footage.

Adams drove his vehicle to Washington, D.C. from his home in Utah with two other men. Shortly before coming to Washington D.C., Adams posted a photo of himself and two other men on his Parler account along with a text stating that they were "starting the road trip for Washington D.C."



*Figure 1 – Photo posted to Adams's Parler account, @JDGNG. Adams is the individual on the left, wearing the black jacket with white stripes and camouflage pants*

In addition, previewing his violent plans, Adams posted the text below on Parler, which reads in part, "driving out to DC to smack a couple of politicians around."



*Figure 2 - Part of the text posted to Adams's Parler account before he arrived in DC*

As discussed in the Statement of Offense, ECF No. 20, at 12:58 p.m. January 6, 2021, rioters breached a set of barricades located at the Peace Circle which demarcated the restricted Capitol Grounds, pushed past a handful of United States Capitol Police (USCP) officers, and began flooding into the Capitol's Lower West Plaza. There, police officers had established a defensive line consisting of interconnecting metal bicycle racks running North to South, with officers—some in riot gear—stationed inside of the line between rioters and the Capitol Building. As the mob arrived at the Lower West Plaza, they and law enforcement officers began fighting over the establishment and reinforcement of the defensive line, a fight that lasted for the next hour and a half and involved the use of fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and other weaponry brought to the Capitol building by the rioters or seized from the inaugural stage construction site.





*Figures 3 through 6 - The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). The bottom right photo shows the nearly completed bicycle rack barrier line as of 1:39 p.m., which was later completely overrun.*

Following the conclusion of the former president's speech at approximately 1:15 p.m., the crowd on the Lower West Plaza rapidly increased in size, supplemented by individuals who walked from the Ellipse to the Capitol. At 2:03 p.m., public officials began broadcasting a recorded dispersal order to the crowd. It began with two blaring tones, followed by a 30-second announcement, which was played on a continuous loop: "This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon."

At approximately the same time, MPD Civil Disorder Unit 42 (CDU-42) arrived on the North side of the Lower West Plaza to reinforce USCP officers stationed there. MPD Lieutenant W.H. commanded CDU-42, which was comprised of approximately 20 officers wearing riot gear. As CDU-42 officers began to make their way through the crowd towards the previously formed police line, multiple rioters assaulted them and forced them to a momentary standstill. W.H then ordered the CDU-42 officers to keep pushing forward through the mob. When those officers finally arrived at the police line, the officers in that line opened a space in the line for them to enter through. W.H. stood on the outside of the metal bike rack barricade, helping his officers file into the safe area, and verifying that the entire squad made it through the mob.

5

***Adams Assaults MPD Officer W.H.***

At this point, Defendant Adams, a thickly-set man who is six feet and two inches tall, began his assaultive conduct. Specifically, at 2:04 p.m., he emerged from the mob and walked toward the line of CDU-42 officers with his hands raised over his head. Adams walked straight at the officers until he intentionally pushed into them, forcing the officers to move around him.



*Figure 7 - MPD Body Worn Camera (BWC) Video showing Adams walking toward CDU-42 officers filing into the safe area behind the barricade*



*Figure 8 - MPD BWC video showing Adams pushing into an officer*

As Adams walked into the officers, W.H. pushed Adams back several feet. Adams then turned and charged at the police line, attacking W.H. and other police officers who attempted to push him back.



*Figure 9 - Third-party video showing Adams moving toward W.H. (wearing a yellow jacket)*



*Figure 10 - MPD BWC video of Adams attacking W.H.*



*Figure 11 – Recording from W.H.'s BWC showing Adams attacking him.*

Adams struck W.H. twice in the head with his hands. One of the blows hit the face mask of

W.H.'s helmet. The second blow hit W.H.'s face underneath the mask.

8



*Figure 12 - Third-party video of Adams first blow (circled in red), making contact with W.H.'s helmet*



*Figure 13 - Third-party video of Admas's second blow (circled in red), hitting W.H.'s face underneath the face mask*

After Adams struck W.H., other officers immediately pushed him back. But Adams continued to gesture aggressively and yell at the officers, "Push me again! Push me again!" Other rioters attempted to hold Adams back from rushing at the police again. During this time, W.H. and the last members of CDU-42 were finally able to get behind the police line.



*Figure 14 - MPD BWC video showing Adams threatening police officers, while another rioter holds him back*

### *Adams Hits Another Officer with a Plastic Bottle and Removes a Link in the Police Barricade*

After attacking W.H., Adams sat down for several minutes. Adams got up again around 2:10 p.m. and went back to the front of the mob confronting the police line. Adams then picked up a pair of handcuffs that an officer had dropped, handed them to one officer, and advised a different officer to go to "higher ground."

At 2:13 p.m., Adams moved to the end of the police line and began attempting to disconnect one of the bicycle rack links in the barricade the police used to hold the rioters back.

10



*Figure 15 - BWC video of Adams attempting to remove a police barricade*

At this moment, numerous other rioters were yelling and fighting with the police. When an officer attempted to prevent Adams from removing the barricade, Adams threw a water bottle at the officer.



*Figure 16 - MPD BWC video of Adams throwing a plastic bottle at a police officer trying to stop him from removing a barricade*

Seconds later, Adams grabbed the barricade with both hands and pulled it away from several police officers.



*Figure 17 - MPD BWC of Adams removing the police barricade*

12

Adams and another rioter dragged the barrier away from the police line, and it disappeared into the mob.



*Figure 18 - MPD BWC video of the barricade Adams removed (circled in red) being taken away into the mob*

Removing the barrier created a gap in the police line which officers attempted to fill with their bodies. But despite the officers' efforts, at approximately 2:28, rioters succeeded in overwhelming the police and surged through the gap that Adams had created, flooding into the

West Plaza of the Capitol. The police defensive line crumbled in multiple places, and a general

retreat was called. Many of these rioters subsequently entered the Capitol building.



*Figures 19-21 – Breakthroughs in the defensive line on both the left and right flanks (top image) caused the entire police line to collapse.   As the crowd swallowed individual officers (middle image), many were assaulted as they retreated through doors and*

14

*stairwells up onto the inaugural stage (bottom image).*

After the riot, Adams posted on Parler that "[w]e safely made it out of Washington DC before the lockdown, and before the gunfire of the capitol police[.] Got a little roughed up but the politicians are no longer meeting the standards We the People require our elected officials to meet."



*Figure 22 - Post from Adams's Parler account, @JDGNG*

### *Adams Statements to the FBI*

On October 17, 2023, after agreeing to plead guilty, Adams participated in a voluntary interview with the FBI in the presence of his lawyer. During the interview, Adams explained that he and two individuals whose names he claimed to not know drove in his vehicle from Utah to Washington D.C. to attend a protest related to the 2020 presidential election. After the interviewing agents confronted Adams with the names of the friends that he travelled with, Adams then admitted to knowing them.

Adams stated that he and his friends walked with a large group of people to the West side of the Capitol building, where he saw that law enforcement officers had set up barricades and deployed chemical agents. Adams said that he stood near one of those barriers, which a law

enforcement officer subsequently opened to let other officers into the barricaded area. Adams then stated that he did not try to push or be aggressive towards the police, but when one officer pushed him to the ground, he became upset and pushed back. The interviewing Agent asked Adams if he had pushed or punched the officer, and Adams maintained that it was a "push."

Adams said that he later took a bike rack barrier into the crowd. He took the barrier because he was upset that police officers were blocking entry to the United States Capitol and that he had been exposed to chemical agents.

### III.    THE CHARGES AND PLEA AGREEMENT

On October 26, 2022, a federal grand jury returned a five-count indictment charging Adams with, amongst other offenses, violating 18 U.S.C. § 111(a) (assault on a federal officer). On August 24, 2023, Adams pled guilty to that offense pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Adams now faces sentencing on 18 U.S.C. § 111(a). As noted by the plea agreement and the Presentence Report (PSR) issued by the U.S. Probation Office, Adams faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, $2,000 in restitution, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   The plea agreement and PSR set the base offense level at 14 pursuant to U.S.S.G. §2A2.2(a), and include the §3A1.2(c)(1) six-level enhancement because Adams' conduct during

the instant offense was knowingly perpetrated against a police officer. PSR ⁋ 34. Adams knowingly: (1) walked into and made physical contact with CDU-42 officers attempting to reinforce the defensive line at the Lower West Plaza; (2) hit MPD Lieutenant W.H. twice in the head; (3) threw a plastic bottle at another officer; and (4) pulled a bike rack out of the hands of an officer and handed it back into the mob of rioters. The PSR also includes a two-level reduction pursuant to §3E1.1(a), since Adams demonstrated acceptance of responsibility by pleading guilty to the charge against him in this matter and through his disclosures made during the presentence investigation (although they required prompting from the interviewing agents), and a one-level reduction pursuant to §3E1.1(b) since Adams's base offense level prior to taking §3E1.1(a) is greater than 16.

The parties thus agree on the following Guidelines calculation:

Count Two: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | **Total** | **17** |

*See* Plea Agreement at ¶¶ 5(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not

---

[2] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

apply in this case because Adams engaged in violence on January 6. *See* U.S.S.G. § 4C1.1(3). The government is aware of at least two cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC) and *United States v. Baquero*, 21-cr-702 (JEB).

Further, the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants

18

who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history. Moreover, Adams unique behavior amongst the riot, where he intentionally and violently assaulted multiple officers, deserves such a variance.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 48. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 17, Adams's Guidelines imprisonment range is 24 to 30 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the recommended term of incarceration.

**A.      Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Adams's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Adams stepped out in front of other rioters to push and interfere with police officers who were trying to get to safety, and attacked officers who were trying to prevent the mob from crossing police lines. Adams also pulled a police barricade out of the hands of officers, opening a gap in the police line which other rioters surged through, contributing to collapsing the police line and assisting the mob's entrance into the Capitol building. The nature and circumstances Adams's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' incarceration.

**B.  The History and Characteristics of the Defendant**

Adams is a licensed gun dealer from West Jordan, Utah with a history of assaultive and disorderly behavior, both before and after his actions on January 6. Specifically:

- In 2019, Adams was convicted of assault and disorderly conduct based upon his involvement in a road-rage incident. On January 6, 2019, Adams told the police that he was driving his vehicle when he passed a silver truck that was going slower than normal. According to Adams, as he passed the truck, the driver flipped him off and started yelling at him. The pair stopped at an intersection, where they started fighting. Each driver then got back into their vehicles, drove to the nearby gas station, and resumed fighting. Officers interviewed the driver of the other vehicle, along with multiple witnesses, who all identified

Adams as the aggressor. On February 12, 2019, Adams entered a plea of abeyance and was ordered to complete an anger management class and pay a fine of $1,085. *See* PSR ⸿ 45.

- On July 26, 2022, Adams was charged by information in the South Jordan Justice Court, Salt Lake City, Utah, with disorderly conduct, reckless driving, and driving on a denied license. According to the arrest report, Adams allegedly tried to run a woman off the road and subsequently banged the roof of her car while her three-year-old child was in the back seat, yelling profanities and demanding that she exit the car. A third-party witness observed the incident and gave a statement to the police. On October 18, 2022, Adams was convicted of disorderly conduct and sentenced to 90 days in jail, all suspended. Adams was ordered to pay a fine of $350.00 and placed on probation for one year. *See* PSR ⸿ 46.

- On October 19, 2022, Adams was arrested and charged with Assault on a Federal Officer in violation of 18 U.S.C. § 111(a). According to the PSR, when FBI agents came to Adams's residence and informed him of the outstanding arrest warrant, he responded he was not willing to be arrested and retreated into the residence. As an agent grabbed his arm, the Adams swung his arm and struck one of the agents in the face with his elbow. Adams then continued to physically resist, retreated further into the home, and refused to comply with verbal commands. Four agents attempted to restrain Adams and place him in handcuffs, but he continued to resist. Once in handcuffs, the defendant continued making threatening remarks, such as "I will kick your ass." Following a two-day jury trial in the District of Utah, Adams was acquitted of the charge. *See* PSR ⸿ 53.

21

As described above, Adams's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, amidst other prior convictions and arrests for assaultive conduct, in which Adams became upset and acted violently toward other people. His history of assaultive behavior is consistent with the statements Adams made both before he traveled to Washington D.C. and engaged in the January 6 riot— when he said that he was "driving to DC to smack a couple of politicians around"—and after the riot, when he told FBI Agents that he assaulted police officers on January 6 because he was "upset" with the police. Adams's history of lashing out with violence weighs in favor of the recommended term of incarceration.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports the recommended sentence of incarceration. Adams's criminal conduct on January 6 was the epitome of disrespect for the law. As this Court stated at the sentencing in *U.S. v. Cynthia Ballenger and Christopher Price*, 21-CR-719-JEB, "one of the most important features of a republic is the peaceful transfer of power where the party that loses an election cedes power to the party that triumphs at the election. […] And yet on January 6, a mob of people bent on undoing that election gathered in Washington and ultimately stormed the Capitol…." Understanding Adams's assault against police officers within this context further demonstrates the seriousness of the offense and the need for a sentence of imprisonment in order to promote respect for the rule of law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of incarceration. While Adams agreed to plead guilty and spoke with the FBI, the statements Adams made in that interview demonstrate that, notwithstanding his guilty plea, he continues to refuse to fully accept responsibility for his actions, while minimizing his offensive conduct. For example, Adams insisted that he only "pushed" W.H. Even when shown video of the attack, he continued to maintain that it was just a "push." This minimization and refusal to accept responsibility is consistent with statements he made immediately after January 6 on Parler, in which he claimed he "got a little roughed up" but "safely made it out of Washington … before the gunfire of the capitol police." These statements—which make no mention of Adams's assault and breach of the police line—falsely suggest that the police, not Adams and the other the rioters, were the aggressors.

Adams's failure to fully admit to his actions, combined with his pattern of assaultive

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

behavior that has continued since January 6, warrant a sentence that provides specific deterrence from committing future crimes.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United*

*States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

25

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *U.S. v. Kevin Creek*, 21-CR-645, the defendant pled guilty to one count of violating 18 U.S.C. 111(a)(1) for actions taken near the same time and location as Adams. As found by Judge Friedrich, Creek made a deliberate choice to join the mob even after his friends held back, despite evidence that a violent conflict was underway, and he played a pivotal role in

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

breaching the police line and opening the floodgates to the mob's entry into the Capitol. The same is true of Adams. Further, like Adams, Creek hit an officer in the face shield of his helmet and pushed through the bike rack barrier. Creek also shoved and kicked another officer, and he did not succeed in entering the Capitol building. While noting that Creek had honorable military service, character letters, and appeared to be deeply committed to his family and community, Judge Friedrich sentenced Creek to 27 months' imprisonment, the midpoint of the Guidelines range.

In *U.S. v. Cale Clayton*, 1:22-CR-139, Judge Lamberth sentenced another defendant who assaulted police officers on the West Front of the Capitol to 30 months of incarceration. Clayton verbally harassed police officers on the Upper West Terrace, yelling taunts such as "You guys are losing a lot of bodies. We're coming in, one way or another, we're coming in." At one point, Clayton grabbed an officer's shield and stole an officer's baton. When officers attempted to retrieve the baton from Clayton, he assaulted one of them. Like Adams, Clayton struck the officer in the helmet and grabbed his face mask. Also similar to Adams, Clayton minimized his actions when interviewed by the FBI. Notwithstanding significant mitigation evidence presented at sentencing, Judge Lamberth sentenced Clayton, who pled guilty to two counts of 18 U.S.C. 111(a)(1), to 30 months in prison.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, W.H, did not suffer bodily injury as a result of Adams's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Adams must pay $2,000 in restitution, which reflects in part the role Adams played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Adams's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

and other victim entities. *See* PSR ¶ 14.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of imprisonment, a term of supervised release of three years, restitution of $2,000, and a mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:      */s/ Brian Morgan*
BRIAN MORGAN
Trial Attorney
NY Bar No. 4276804
601 D Street NW
Washington, DC 20530
Brian.morgan@usdoj.gov
(202) 305-3717